1 | KRISTIN E. MEREDITH
Nevada Bar No. 11655
2 |   E-Mail: meredith@lbbslaw.com
PRISCILLA L. O'BRIANT
3 | Nevada Bar No. 10171
   E-Mail: pobriant@lbbslaw.com
4 | LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 S. Rainbow Boulevard, Suite 600
5 | Las Vegas, Nevada 89118
Telephone: (702) 893-3383
6 | Facsimile: (702) 893-3789
*Attorneys for Defendant Nationwide Mutual*
7 | *Insurance Company (Nationwide)*

8 | **UNITED STATES DISTRICT COURT**

9 | **DISTRICT OF NEVADA**

10 |

| | |
|---|---|
| 11 | DONALD BRASHEAR, an individual, | Civil Action No.: 2:12-cv-01691-LRH-CWH |
| 12 | Plaintiff, | |
| 13 | vs. | **DEFENDANT NATIONWIDE MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY ADJUDICATION OF ISSUES** |
| 14 | NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio corporation, DOES I-X, inclusive; and ROE CORPORATIONS 1-10, inclusive; | |
| 15 | | |
| 16 | Defendants. | |
| 17 | | |

18 | COMES NOW Defendant Nationwide Mutual Insurance Company ("Nationwide") and

19 | moves this Court, pursuant to FRCP Rule 56(c), for an Order granting summary adjudication in its

20 | favor and against Plaintiff Donald Brashear on the claims for "bad faith" and violation of the

21 | Unfair Claims Settlement Practices Act. The basis for this motion is that the material facts

22 | necessary to adjudicate these claims are undisputed and the Court can rule on these claims as a

23 | matter of law.

24 | Alternatively, Nationwide seeks adjudication of the punitive damage claim in its favor.

25 | / / /

26 | / / /

27 | / / /

28 | / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    This motion is made upon the attached Memorandum of Points and Authorities, the

2  Declaration of Kristin E. Meredith filed concurrently herewith, the Declaration of Philip Battin

3  filed concurrently herewith, the Declaration of Brian Mustard filed concurrently herewith, the

4  pleadings and papers on file herein, and upon such oral argument as shall be allowed at the time of

5  the hearing.

6    Dated this 23 day of May, 2013.

7                                    LEWIS BRISBOIS BISGAARD & SMITH LLP

8

9

                            By:  _Krist E. Meredith_

10                                 KRISTIN E. MEREDITH, Esq.
                                   Nevada Bar No. 011655
11                                 PRISCILLA L. O'BRIANT, Esq.
                                   Nevada Bar No. 010171
12                                 6385 S. Rainbow Boulevard, Suite 600
                                   Las Vegas, Nevada 89118
13                                 *Attorneys for Defendant Nationwide Mutual*
                                   *Insurance Company (Nationwide)*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## TABLE OF CONTENTS

2

Page

3  I. INTRODUCTION ........................................................................................................ 3

4  II. STATEMENT OF FACTS ........................................................................................ 4

5      A.   The Nationwide Policy ............................................................................... 4

6      B.   The Motor Vehicle Accident ...................................................................... 4

7      C.   Chronology of Plaintiff's Injuries, Complaints and Treatments Prior to the January 2008 Accident ............................................................................. 5

8

9      D.   Post-Accident Treatment ............................................................................ 7

    E.   Subsequent Treatment Months After the Accident .................................... 8

10      F.   Chronology of Claims Handling ............................................................... 11

11  III. LEGAL ARGUMENT .......................................................................................... 22

12      A.   As a Matter of Law, an Insurer Does Not Act in Bad Faith When a Fairly Debatable Issue of Fact or Law Provides a Reasonable Basis For An Insurer's Actions .................................................................................... 23

13

14

15      B.   Summary Judgment Should Be Granted in Favor of Nationwide On the Claim For Bad Faith Because This Case is Nothing More Than a Dispute Over the Nature, Extent and Cause of Brashear's Injuries ....................... 25

16

17      C.   The Unfair Insurance Practices Act Claim ............................................... 27

    D.   Brashear Has No Clear and Convincing Evidence to Justify an Award of Punitive Damages .................................................................................... 27

18

19  IV. CONCLUSION ..................................................................................................... 30

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

i

1

## TABLE OF AUTHORITIES

2

### FEDERAL COURT CASES

3   *A Bard's Apparel Manu, Inc. v. Bituminos Fire and Marine Ins. Co.,*
        849 F.2d 245 (6th Cir. 1988) ........................................................................................ 25

4

*Celotex Corp. v. Catrett,*
5       477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................................... 22, 23

6   *Cleveland v. Policy Management Systems Corp,*
        526 U.S. 795, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) ........................................ 23

7

*Guebara v. American Family Insurance Company,*
8       237 F.3d 987 (9th Cir. 2001) ....................................................................................... 25

9   *Matsushita Electric Industries Co. v. Zenith Radio Corp.,*
        475 U.S. 574 (1986) .................................................................................................... 23

10

### NEVADA COURT CASES

11

*Ainsworth v. Combined Ins. Co.,*
12      104 Nev.  587, 763 P.2d 673 (1988) ........................................................................... 29

13  *Albert H. Wohlers & Co. v. Barges,*
        114 Nev. 1249, 969 P.2d 949 (1998) .......................................................................... 29

14

*Allstate Ins. Co. v. Miller,*
15      212 P.3d 318 (Nev. 2009) ........................................................................................... 23

16  *Am Excess Ins. Co. v. MGM,*
        102 Nev. 601, 729 P.2d 1352 (1986) .......................................................................... 23

17

*Clark v. Labrets,*
18      113 Nev. 1089, 944 P.2d 861 (1997) .......................................................................... 29

19  *Dillard Department Stores v. Beckwith,*
        115 Nev. 372, 989 P.2d 882 (1999) ............................................................................ 28

20

*Guaranty National Ins. Co.  v. Potter,*
21      112 Nev. 199, 912 P.2d 267 (1996) ............................................................................ 24

22  *Jeep Corp. v. Murray,*
        101 Nev. 640, 708 P.2d 297 (1985) ............................................................................ 29

23

*Pemberton v. Farmers Ins. Exchange,*
24      109 Nev, 789, 858 P.2d 380 (1993) ............................................................................ 23

25  *Ramada Inns v. Sharp,*
        101 Nev. 824, 826, 711, P.2d 1 (1985) ....................................................................... 28

26

*Smith Food & Drug Centers, Inc. v. Bleared,*
27      114 Nev. 602, 958 P.2d 1208 (1998) .......................................................................... 28

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*U.S. Fidelity & Guaranty Co. v. Peterson,*
   91 Nev. 617, 540 P.2d 1070 (1975) .................................................................................. 23

*United Fire Insurance Company v. McClelland,*
   105 Nev. 503, 780 P.2d 193 (1989) ................................................................................ 28

*United Nuclear Corp. v. Allendale Mutual Ins. Co.,*
   709 P.2d 649 (N.M. 1985)................................................................................................ 24

*United States Fidelity Guaranty v. Peterson,*
   91 Nev. 617, 540 P.2d 1070 (1975) ................................................................................ 28

*Wickliffe v. Fletcher Jones of Las Vegas, Inc.,*
   99 Nev. 353, 661 P.2d 1295 (1983) ................................................................................ 29

### OTHER STATE COURT CASES

*Chester v. State Farm Ins. Co.,*
   789 P.2d 534 (Idaho 1990)............................................................................................... 24

*Hamm v. Allied Mutual Ins. Co.,*
   612 N.W.2d 775 (Iowa 2000)........................................................................................... 24

*HOA v. Associated Internat. Ins. Co.,*
   90 Cal. App. 4th 335 (2001)............................................................................................ 24

*LeFevre v. Lamar,*
   590 So. 2nd 154 (Ala. 1991) ........................................................................................... 25

*Stevenson v. Union Standard Ins. Co.,*
   746 S.W. 2nd 39 (Ark. 1988)........................................................................................... 25

*Town & Country Mutual Ins. Co. v. Hunter,*
   472 N.E.2d 1265 (Ind. App. 1985).................................................................................. 24

### STATE STATUTES

R.S. 686A.310(2) ................................................................................................................... 27

### FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 56 ................................................................................................................... 22

Fed. R. Civ. P. 56(c)............................................................................................................... 22

### STATE RULES AND REGULATIONS

Fed. R. Civ. P.5(b).................................................................................................................... 1

Fed. R. Civ. P.Rule 56(c) ......................................................................................................... 1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

<u>OTHER AUTHORITIES</u>

2  *Trace America Report. The Trace America Report* (dated July 30, 2010) ..................................... 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**I.**

**INTRODUCTION**

This litigation arises out of a claim for underinsured motorist's benefits by Plaintiff Donald Brashear ("Brashear"). Brashear presented a claim under the underinsured motorists provisions of a commercial automobile policy issued to Brashear's employer, D.R. Bowles Plumbing ("Bowles Plumbing"). On January 9, 2008 Brashear was sitting in a Bowles Plumbing van on the side of the freeway waiting to have a flat tire repaired when the van was impacted on the right rear and side by tortfeasor, Stacy Clayton ("Clayton"). Brashear drove the van from the scene after the accident. The next day, he reported to work and performed his regular work duties. He did not go to a doctor until five days after the accident. At that time, he was diagnosed with neck and back strain/sprain and underwent approximately 2-1/2 months of physical therapy. He was discharged and returned to full work duty status and continued to work full time as a plumber for Bowles Plumbing. In mid-October 2008, nine months after the accident, Brashear sought treatment for low back pain. He eventually treated with Dr. Rosler, receiving injections and, in March, 2011, underwent back surgery with Dr. Grover.

Prior to the accident, Brashear had an extensive history of complaints of chronic low back pain and of receiving pain medication for this low back pain. He also had had at least three accidents involving his back prior to the January 2008 accident.

Brashear made a claim against the tortfeasor and received the $100,000 policy limits from the tortfeasor's insurer. Two years after the accident, Brashear presented an underinsured motorist ("UIM") claim to Nationwide. Nationwide reviewed all of Brashear's medical records; evaluated the injuries, the medical specials incurred and the treatment undertaken; considered Brashear's initial injuries, complaints, treatments and recovery, including the less than three months of treatment; and also considered the gap of nine months between his March 2008 recovery and October 2008 new complaints. Nationwide conducted two recorded statements of Brashear and also had Brashear undergo an Independent Medical Examination ("IME"). Nationwide determined that Brashear had been fully compensated by the $100,000 payment from the tortfeasor. Brashear disagreed and filed the instant lawsuit.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                                    3

1    Nationwide submits that it has a reasonable and objective basis for its value of Brashear's

2  claim. Nationwide acknowledges that Brashear disagrees with its evaluation, but given the

3  undisputed evidence regarding the nature and extent of the injury in January 2008, Brashear's

4  prior history of low back pain and treatment for that pain, the medical treatment Brashear received

5  in the period January through March 2008 and his recovery, and the IME report, Nationwide

6  submits that this case is nothing more than a genuine dispute over causation and the value of

7  Brashear's claim. As such, it does not meet the legal criteria for "bad faith" and judgment should

8  enter in Nationwide's favor on these claims.

9                                          II.

10                              **STATEMENT OF FACTS**

11  **A.    The Nationwide Policy**

12    Nationwide issued a Business Auto Policy, policy no. ACP BA 7821 949333 to D.R.

13  Bowles Plumbing LLC for the period of 8-30-07 to 8-30-08. The policy provided liability limits

14  of $1 Million and underinsured motorist limits of $1 Million.[1]

15  **B.    The Motor Vehicle Accident**

16    At approximately noon on January 9, 2008, Brashear, a 30 year old plumber, was driving a

17  2000 Dodge Ram van in the course and scope of his employment with D.R. Bowles Plumbing.

18  Brashear was traveling northbound on US 95 when a tire blew out. Brashear pulled to left

19  shoulder and stopped the van. Brashear placed the van onto a jack and re-entered the vehicle. At

20  that time, Stacy Clayton, driving a 2004 Nissan Quest van, was traveling northbound on US 95 in

21  the left travel lane. Clayton failed to maintain her travel lane, crossed into the shoulder and the

22  left side of her vehicle struck the right side of the van, pushing the van off the jack. The Traffic

23  Accident Report ("TAR") references "moderate" damage to the "side" of each vehicle, the "left

24  side" of the Clayton vehicle and the "right side" of the Ram van. The TAR does not indicate any

25  / / /

26  / / /

27  _____

28  [1] Undisputed Fact [U.F.] No. 1 - See, Declaration of Kristin E. Meredith (Decl. Meredith), ¶3, Exhibit 1.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                    4

1  damage to the "rear" or "right rear" of the van.  The TAR also indicates that neither driver

2  reported injuries at the scene.[2]

3        The property damage photos of the Bowles Plumbing van demonstrate damage to the right

4  rear of the vehicle, including the rear bumper.  There is no damage in the photos to the front of the

5  van.[3]  The estimate for repair of the property damage to the Bowles van was $4,696.95.[4]

6  **C.**    **Chronology of Plaintiff's Injuries, Complaints and Treatments Prior to the January**

7       **2008 Accident**

8  **2001**

9  April 7               Auto accident in Louisiana.  Treats at East Jefferson General Hospital.
                          Complaints: rear-ended in a motor vehicle accident, neck and lower back

10                           pain, moderate.[5]

11 **2002**

12 December 16        Workers compensation job injury; Lloyd Gibbs Plumbing.  Lifted
                          50 gallon water heater on to 2 ft. stand.  Treats at UMC Quick Care;

13                           lumbar strain/sprain; low back pain.[6]

14 **2005**

15 March 1             Presents to Dr. Steven Folkerth with claims of low back pains for last two
                          weeks.[7]

16 Prescription drug use in 2005:  35 prescriptions for Hydrocodone, 1,360 pills (3.7 pills per day).[8]

17 **2006 or 2007**

18 Unknown date      Alleges injury at work; water heater fell on his back while employed by

19                           D.R. Bowles.[9]

20 _____

21 [2] U.F. No. 2 - See, Declaration of Brian Mustard (Decl. Mustard), ¶3, Exhibit 1.

  [3] U.F. No. 3 - See, Id. at ¶4, Exhibit 2.

22 [4] U.F. No. 4 - See, Id. at ¶5, Exhibit 3.

23 [5] U.F. No. 5 - See, Id. at ¶6, Exhibit 4, Match #1 at BRA0023CF;  see also, Decl. Meredith, ¶4, Exhibit 2 (spec.
HJC03490) and ¶5, Exhibit 3 at pp. 38:13 to 40:13.

24 [6] U.F. No. 6 - See, Decl. Mustard, ¶6, Exhibit 4, Match #2 at BRA0023CF to BRA0024CF; see also, Decl. Meredith

25 ¶6, Exhibit 4 and ¶5, Exhibit 3 at pp. 26 to 29, supra.

  [7] U.F. No. 7 - See, Decl. Meredith, ¶7, Exhibit 5 at. HJC08924.

26 [8] U.F. No. 8 - See, Id. at ¶8, Exhibit 6 at BRA0023NPB to BRA0024NPB.

27 [9] U.F. No. 9 - See, Decl. Mustard, ¶6, Exhibit 4, Match #3 at BRA0023CF to BRA0024CF; see also, Decl. Meredith,
¶5, Exhibit 3 at pp. 20:23 to 22:14.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**2006**

August 23        Treats with Dr. Folkerth complaining of low back pain.[10]

Prescription drug use 2006:  41 prescription for Hydrocodone 2350 pills (6.4 pills per day).[11]

**2007**

October 3        Presents to Folkerth complaining of intractable lower back pain; worse. Folkerth states might be lumbar disc disease.[12]

November 9        Presents to Folkerth complaining of lower back pain.  Folkerth advises that no further prescriptions until Brashear undergoes a full medical work-up with x-rays and MRI's.[13]

November 15        Presents to Olayinka F. Alonge M.D. ("Alonge").  Brashear complained of low back pain, back pain radiation, mid-back pain, and sacral back pain.  He also reported paresthesia of back or legs and in arms, legs or face.  Brashear reported experiencing back pain for over a year with sudden onset mid-back pain, worsening over the last 3-4 days.  Brashear reported that he was struck in the back by a falling object.  Brashear reported he could only lift very light weights as a result of his back pain and was prevented from sitting or standing for more than 10 minutes.  He rated his pain at 10/10 and indicated the pain reduced his sleep to one-half.[14]

December 6        Presents to Dr. Alonge; back pain is 8-9/10.[15]

December 19        Presents to Dr. Alonge; worsening pain, referred to pain management.[16]

Prescription drug use for 2007:  18 prescriptions for Hydrocodone, 5 prescriptions for Oxycodone, 3210 pills (9.7 pills per day).[17]

**2008**

January 2        Presents to Dr. Alonge; low back pain.[18]

/ / /

---

[10] U.F. No. 10 - See, Decl. Meredith, ¶7, Exhibit 5 at HJC08923.

[11] U.F. No. 11 - See, Id. at ¶8, Exhibit 6 at BRA0021NPB to BRA0023NPB.

[12] U.F. No. 12 - See, Id. at ¶7, Exhibit 5 at HJC08918 to HJC08919.

[13] U.F. No. 13 - See, Id. at ¶7, Exhibit 5 at HJC08921; See also Decl. Meredith, ¶9, Exhibit 7 at p. 50.

[14] U.F. No. 14 - See, Id. at ¶10, Exhibit 8 at PL0016 to PL0017.

[15] U.F. No. 15 - See, Id. at ¶10, Exhibit 8 at PL0018 to PL0019.

[16] U.F. No. 16 - See, Id. at ¶10, Exhibit 8 at PL0020.

[17] U.F. No. 17 - See, Id. at ¶8, Exhibit 6 at BRA0020NPB to BRA0021NPB.

[18] U.F. No. 18 - See, Id. at ¶10, Exhibit 8 at PL0021 to PL0022.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**D.     Post-Accident Treatment**

  **1.     Olayinka Alonge, M.D.**

   On January 14, 2008, Brashear reported post-accident to Dr. Alonge.  Brashear reported that he was in a car accident several days ago.  Brashear indicated he initially felt fine but was getting worse.  He complained of a stiff neck, and pain in the shoulder blades, t-spine, lower back and buttocks.[19]

   On January 25, 2008, Brashear reported for follow-up to Alonge.  Brashear reported his pain was still severe.  Alonge referred him to Dr. Edward Outlaw ("Outlaw") for pain management.[20]

  **2.     Edward Outlaw, M.D.**

   On January 29, 2008, Brashear reported to Dr. Outlaw.  On examination, Outlaw reported decreased range of motion at the lumbar spine and increased pain with flexion at the L-spine. Outlaw's assessment included:  (a) thoracic strain/sprain; and (b) lumbar strain/sprain. Based on the examination, Outlaw recommended physical therapy to help decrease Brashear's pain.  Outlaw then referred Brashear to Kelly Hawkins Physical Therapy.[21]

   Brashear underwent physical therapy from January 30 to March 21, 2008.[22] On March 11, 2008, Brashear reported 20-30% relief of his pain from physical therapy.[23]  Over the course of physical therapy, Brashear reported continual progress.  At his March 21, 2008 physical therapy session, Brashear reported he was feeling good, 90% better.[24]

   On March 27, 2008, Brashear informed Outlaw that he still had some pain but was ready to return to full duty.  Outlaw noted that Brashear advised he "feels in good enough shape to go back to work full work duty."  Outlaw further noted that he had performed a full-duty trial.  Outlaw

---

[19] U.F. No. 19 - See, Decl. Meredith, ¶10, Exhibit 8 at PL0023 to PL0025.

[20] U.F. No. 20 - See, Id. at ¶10, Exhibit 8 at PL0025 to PL0026; see also Id. at ¶11, Exhibit 9 at PL0059.

[21] U.F. No. 21 - See, Id. at ¶11, Exhibit 9 at PL0074 to PL0076; see also, Id. at ¶12, Exhibit 10 at KGHA-00020.

[22] U.F. No. 22 - See, Id. at ¶13, Exhibit 11 at KGHA-B-00002 to 00003.

[23] U.F. No. 23 - See, Id. at ¶11, Exhibit 9 at PL0062.

[24] U.F. No. 24 - See, Id. at ¶12, Exhibit 10.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                                    7

1  returned Brashear to full duty with no restrictions, and indicated Brashear should return to the

2  clinic in approximately two weeks for reevaluation. Brashear did not return for reevaluation or

3  further treatment.[25]

4  **E.    Subsequent Treatment Months After the Accident**

5  Brashear went nearly six (6) months without complaint or incident. He then began a series

6  of treatment with various providers as follows:

7  **1.    Sean Dunleavy, D.C.**

8  On October 16, 2008, Brashear presented to Sean M. Dunleavy, D.C. ("Dunleavy").

9  Brashear complained of intermittent dull neck pain at 6/10; intermittent sharp left lateral rib pain

10  at 8/10; constant dull, sharp throbbing, pins and needles back pain at 3-10/10; intermittent dull

11  upper back pain at 6/10; intermittent dull 4/10 headaches; and sleep disturbance. Brashear

12  reported that his activities of daily living were limited by pain. Brashear reported that he had

13  previously injured his low back 3-5 years past but that his condition resolved in one week.

14  Dunleavy noted the following conclusions: (a) severe decrease in the L5-S1 disc space; (b) mild

15  decrease in the C2-C3, C3-C4 and C5-C6 disc spaces; (c) mild D3D at C5 and C6; (d) traction

16  spur noted in the occipital region of the skull most likely due to ligamentum nuchae tractioning on

17  skull to counter severe forward head posture; and (e) postural misalignments.[26]

18  Dunleavy's treatment plan included physiotherapy modalities to improve proper joint

19  mechanics, decrease inflammation; pain and muscle spasms followed by physiotherapy procedures

20  maximize ranges of motion, stabilize motor units, increase strength and endurance and restore the

21  neuromuscular system.[27] Brashear treated with Dunleavy from October 16, 2008 through April 9,

22  2009.[28] During this time, Dunleavy noted variously that Brashear was benefitting from treatment,

23  that his condition persisted and/or that his condition had worsened. On November 13, 2009,

24

25  [25] U.F. No. 25 - See, Decl. Meredith, ¶11, Exhibit 9 at PL0061; see also, Decl. Meredith, ¶14, Exhibit 12 at p 40.

26  [26] U.F. No. 26 - See, Id. at ¶15, Exhibit 13 at NRC-00011 to NRC-00012.

27  [27] U.F. No. 27 - See, Id. at ¶15, Exhibit 13 at NRC-00014

28  [28] U.F. No. 28 - See, Id. at ¶16, Exhibit 14 at NRC-B-00002 to NRC-B-00004.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Dunleavy prepared a progress report noting that Brashear reported 50% improvement since
2  beginning therapy.[29]

3      **2.    MRIs and Treatment With Jaswinder Grover, M.D.**

4      On December 4, 2008, Brashear underwent MRIs of the lumbar and cervical spines at
5  Axiom Imaging.  The cervical MRI revealed 2.2 mm. disc protrusions that abut the thecal sac at
6  C4-05 and C6-C7, and a straightening of the cervical lordosis which may be due to myospasm.
7  The lumbar MRI revealed a 5.8 mm. left paracentral disc protrusion that abuts the left SI transiting
8  nerve root and produces moderate left neuroforaminal narrowing; a 2.3 mm. disc protrusion that
9  abuts the thecal sac at T12-Ll; and a straightening of the lumbar lordosis which may be due to
10 myospasm.[30]

11      On December 18, 2008, Brashear reported to Jaswinder Grover, M.D.  Brashear completed
12 an *Initial Patient Evaluation* in which **he left the section regarding prior medical history blank**
13 and indicated the date of injury as January 9, 2008.[31]  Pursuant to Grover's report of December 18,
14 2008, Brashear reported the facts of the accident, **including that the impact was at very high**
15 **speed such that his vehicle was pushed into and impacted the median causing immediate**
16 **injuries for which Brashear sought treatment the next day.**  Brashear rated his pain at
17 anywhere from 9-10/10.  **Brashear denied any history of neck pain, lower back pain or similar**
18 **symptoms prior to this accident in January 2008.**[32]

19      Grover reviewed the radiographs and testing and noted that the x-rays were "really
20 unremarkable", but that the lumbar MRI revealed evidence of significant lumbar disc compromise
21 and disc herniation at L5 -S 1, while the cervical MRI revealed evidence of subtle subluxation,
22 disc compromise, protrusion, C4-5, also C6-7.  Grover reviewed the treatment options with
23 / / /

24

25  [29] U.F. No. 29 - See, Decl. Meredith, ¶15, Exhibit 13 at NRC-00036 to NRC-00037; see also e.g., Decl. Meredith, ¶15, Exhibit 13 at NRC-00020 to NRC-00023.

26  [30] U.F. No. 30 - See, Id. at ¶17, Exhibit 15 at AILVLLC-00002 to AILVLLC-00003.

27  [31] U.F. No. 31 - See, Id. at ¶18, Exhibit 16 at NSC-00214.

28  [32] U.F. No. 32 - See, Id. at ¶18, Exhibit 16 at NSC-00164.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Brashear and recommended a trial of some site-specific injection therapy of the cervical and

2  lumbar spine.[33]

3  ### 3.   Injections With Hans Rosler, M.D.

4  On January 2, 2009, Brashear reported to Hans Jorg Rosler, M.D. (Anesthesiology/ Pain

5  Management). Brashear reported ongoing severe intractable low back pain radiating into his left

6  buttock and left lower extremity as well as intrascapular and parascapular pain. **Brashear denied**

7  **any history of similar symptomatology prior to the January, 2008 accident.**[34]

8  On January 9, 2009, Brashear underwent bilateral L5 and S1 selective nerve root blocks

9  with Rosler. Brashear reported a post-operative pain score of 1/10 (down from 7/10 pre-

10  operatively). On follow-up with Rosler, Brashear reported significant improvement of his lumbar

11  symptomology following the nerve root blocks and rated his improvement at 40%.[35]

12  On March 2, 2009, Brashear underwent the repeat bilateral L5 and S1 selective nerve root

13  blocks. Brashear reported a post-operative pain score of 0/10 (down from 4/10 pre-operatively).[36]

14  ### 4.   Further Procedures With Grover

15  On February 5, 2010, Grover noted that a discography CT scan confirmed disruption at

16  L5-S1 with satisfactory controls and an MRI scan in April had identified clear disruption at L5-S1,

17  subligamentous herniation with well-preserved discs proximal to this. On February 11, 2010,

18  Brashear underwent an Intradiscal Electothermy procedure with no complications.[37]

19  Post IDET treatment (March 4, 2010), Brashear reported to Grover significant

20  improvement overall although with some residual discomfort. Grover recommended continuation

21  of orthosis, gradual advancement of activities and reassessment in four to six weeks.[38]

22  / / /

23

---

24  [33] U.F. No. 33 - See, Decl. Meredith, ¶18, Exhibit 16 at NSC-00162 to NSC-00163.

    [34] U.F. No. 34 - See, Id. at NSC-00179.

25  [35] U.F. No. 35 - See, Id. at NSC-00189 to NSC-00190; NSC-00027.

26  [36] U.F. No. 36 - See, Id. at NSC-00185 to NSC-00186.

27  [37] U.F. No. 37 - See, Id. at NSC-00011; NSC-00187 – NSC-00188.

    [38] U.F. No. 38 - See, Id. at NSC-00009.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                    10

1    Nearly one year later and three years after the accident, Brashear reported to Grover

2    January 11, 2011 and February 5, 2011 at which time surgical options were discussed. Brashear

3    underwent an interbody fusion at Southern Hills Hospital on March 30, 2011.[39]

4    On May 7, 2011, Brashear returned to Grover for reevaluation of his condition, status five

5    weeks post APL interbody fusion. Brashear reported improvement of his symptoms but continued

6    to experience "discomfort" in his lower back. Grover noted Brashear ambulated. Grover

7    reviewed x-rays of the lumbar spine which revealed excellent alignment with hardware intact,

8    fusion L5-S1. Brashear returned for the final time on May 17, 2011 for follow-up and continued

9    to complain of ongoing back pain.[40]

10   **F.    Chronology of Claims Handling**

11   **1.    Notice of Claim**

12   On March 26, 2010, Attorney Peter Mortenson ("Mortenson") notified Nationwide via

13   phone that he represented Brashear and that he had nearly $100,000 in medical bills and wanted to

14   make a UIM claim. Nationwide assigned the UM claim to claim representative Brian Mustard

15   ("Mustard").[41]

16   **2.    Initial Investigation**

17   On March 29, 2010, Mustard contacted the law firm and left a message requesting a call

18   back to discuss the facts of the case. Mustard reviewed the TAR and noted that Brashear was in

19   the vehicle when it was struck, that the airbags had not deployed and that Brashear had not

20   claimed injury at the scene.[42]

21   On March 31, 2010, Mortenson called Mustard and advised that Brashear had filed a

22   complaint against the tortfeasor who had $100,000 in BI limits. Mortenson advised that Brashear

23   / / /

24

25   [39] U.F. No. 39 - See, Decl. Meredith, ¶18, Exhibit 16 at NSC-00158 to NSC-00160 and Decl. Meredith ¶19, Exhibit 17 at SHHMC00061 to SHHMC00062.

26   [40] U.F. No. 40 - See, Id. at ¶18, Exhibit 16 at NSC-00154 to NSC-00155.

27   [41] U.F. No. 41 p See, Decl. Mustard, ¶7, Exhibit 5.

     [42] U.F. No. 42 - See, Id. at Mustard, ¶8, Exhibit 6.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                                 11

1  had $108,000 in medical specials related to a back injury and had undergone injections.

2  Mortenson agreed to send a representation letter and a copy of the bills and records to date.[43]

3      On March 31, 2010, Mustard contacted Dave Bowles ("Bowles"), owner of D.R. Bowles,

4  who advised Mustard that the claim was "bogus." Bowles indicated he convinced Brashear to go

5  for a checkup following the accident, that Brashear was not injured and had continued to work

6  through November, 2008. Bowles advised that Brashear came in one day and stated that "his

7  attorney told him that he needs to stop working because his back injury could turn into a

8  permanent injury." Bowles advised he had very serious concerns about the claim. Bowles

9  advised that Brashear was a plumber, which required him to squat, bend, lay down, and lift water

10  heaters and other plumbing equipment and that Brashear had not missed a day of work from the

11  date of the accident until he stopped working in late 2008.[44]

12      **3.   SIU Investigation Opened**

13      On April 1, 2010, Mustard received a letter of representation from Mortenson. Mustard

14  faxed an acknowledgement letter along with a medical authorization and requested permission to

15  take a statement from Brashear.[45] On April 1, 2010, Mustard also ran an ISO search and noted

16  several related claims:

17        Match #1; 1/7/2001; Personal Auto Liability; Brashear was a plumber at the time. Had Complaints of neck pain and was taken to a hospital in Louisiana.

18  
19        Match #2; 12/16/2002; Workers Comp; The claimant lifted a 50 gallon water heater onto a 2 foot stand and strained his lower back.

      Match #3; 6/3/2005; Workers Comp; Brashear was an employee of DR Bowles

20        Plumbing. There was an injury but the index did not specify the type of injury.

21        Match #4; 1/9/2008; Work Comp claim for this auto accident.[46]

22      On April 6, 2010, Mustard received correspondence from Attorney Jason Peck ("Peck")

23  with Mortenson's office. Peck stated that the firm was "not inclined to provide a medical

24  

25  [43] U.F. No. 43 - See, Decl. Mustard, ¶9, Exhibit 7.

26  [44] U.F. No. 44 - See, Id. at ¶10, Exhibit 8.

27  [45] U.F. No. 45 - See, Id. at ¶11, Exhibit 9; ¶12, Exhibit 10; and ¶13, Exhibit 11.

[46] U.F. No. 46 - See, Id. at ¶11, Exhibit 9.

28  

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                    12

1    authorization" but indicated that he was providing the medical bills and records in support of the

2    claim. Peck requested the "insured's limits of liability." Mustard noted that the letter was a single

3    page with no records or bills attached (the records were sent separately and received several days

4    later).[47]

5        On April 6, 2010, Mustard spoke with Peck and requested that Brashear provide a

6    statement, noting several initial concerns with regard to the claim, including Brashear's prior

7    history and his continued employment in a physically demanding job for nearly a year after the

8    accident. Mustard advised that Nationwide would require prior medical records due to the prior

9    back injury complaints.[48]

10       Mustard referred the claim to the Special Investigations Unit ("SIU") to take Brashear's

11   statement and investigator Phil Battin ("Battin") was assigned to provide field investigative

12   assistance.[49]

13       **4.    Review of Records and Statement of Brashear**

14       On April 16, 2010, Mustard provided the law firm with the insured's UM coverage limits.

15   Mustard also reviewed the medical records provided by Plaintiff. Mustard summarized the

16   various providers, symptoms, diagnoses, treatment dates, treatment, and expenses. Mustard noted

17   Brashear "was seen for back pain that had been bothering him for more than a year" by Alonge in

18   the two months immediately prior to the accident, and that Brashear ranked his back pain at 10/10

19   at that visit. Mustard also noted that during his later treatments, Brashear repeatedly reported that

20   he had no pain prior to the January, 2008 accident. Finally, Mustard noted a report from the State

21   of Nevada Prescription Monitoring Program Patient Drug Utilization which indicated 22 instances

22   of hydrocodone prescriptions and 3 instances of oxycodone prescriptions over a 9-month period.[50]

23   / / /

24

25   [47] U.F. No. 47 - See, Decl. Mustard, ¶14, Exhibit 12 and ¶15, Exhibit 13.

26   [48] U.F. No. 48 - See, Id. at ¶15, Exhibit 13.

27   [49] U.F. No. 49 - See, Id.

28   [50] U.F. No. 50 - See, Id. at , ¶16, Exhibit 14 and ¶17, Exhibit 15.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                                              13

1    On April 22, 2010 Battin wrote attorney Peck and requested execution of the medical

2 authorization, identification of Brashear's medical providers and cited to policy provisions

3 regarding the insured's duties.[51]

4    On May 26, 2010, Peck wrote to Battin advising that Brashear agreed to execute the

5 medical authorization, but indicated that the request for a recorded statement was premature as

6 Brashear was still treating. Battin responded that a recorded statement was necessary given the

7 significant passage of time since the accident.[52]

8    On June 21, 2010 Battin conducted a one-hour recorded interview of Brashear and

9 obtained the signed medical authorizations. Battin summarized the recorded statement, in relevant

10 part, as follows:[53]

> Mr. Brashear had poor recollection of the accident and being unable to
> accurately describe what he was limited in doing physically following the
> DOL. . . . When asked, he did not recall his prior (4/7/01) auto/accident or
> his "two" worker's compensation claims (12/16/02 & 6/3/05). He was
> vague regarding the details of each and was unsure of the injuries he
> incurred in those respective claims. He did volunteer that on the DOL he
> was in excellent shape....

> When asked, he did not recall striking any part of the IV's interior with his
> body, but confirmed he did not sustain any cuts or contusions. The cell
> phone he was using was not forced from his hand due to the impact....

> He was asked if he missed any work (2008) and only replied he continued to
> work but only did light duty plumbing jobs (i.e., replacing toilet flappers,
> changing faucet filters, etc....). When asked, he could not estimate how
> many days following the DOL he worked for D.R. Bowles Plumbing; nor
> did he recall just when he actually quit working for D.R. Bowles....

> Brashear and his attorney were then shown approx, 147 DR Bowles invoices
> (in Brashear's handwriting) for 131 separate days between 1/9/2008 (DOL)
> and 12/10/2008. (note: the 147 invoices entailed separate pluming jobs and
> there were multiple jobs on the same day.) Brashear could provide no
> plausible explanation why on the day following the DOL he was able to
> install a soft water system and a garbage disposal at a customer's house all
> the while claiming he had "level 10" pain.

> When asked to explain how (according to his 147 job invoices) he was able
> to install one 40-gal and "nine" 50-gal water heaters, and just as many toilets

---

[51] U.F. No. 51 - <u>See</u>, Declaration of Philip Battin (Decl. Battin), ¶3, Exhibit 1.

[52] U.F. No. 52 - <u>See</u>, Id. at ¶4, Exhibit 2 and ¶5, Exhibit 3.

[53] U.F. No. 53 - <u>See</u>, Id. at ¶6 and ¶7, Exhibit 4.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1
2
3

(average weight: 75lbs), reverse osmosis water systems and garbage disposals (both requiring installationn under kitchen sinks) – all the while claiming severe injury and receiving medical/physical therapy treatments, Brashear could again provide no plausible explanation.

4   The recorded statement was continued since Battin did not have all of Brashear's medical

5   records. Following the synopsis of Brashear's statement, Battin includes a "memo to file" noting

6   that at the conclusion of the recorded statement, Peck held back Brashear as Battin exited the

7   building. Battin then observed a white panel utility van with two folding ladders attached to a roof

8   mounted rack, and a sign that read "The Plumbing Dr. 702-324-4967." Battin noted that this was

9   Brashear's cell phone number. Battin then observed Brashear exit the law offices and enter the

10  van.[54]

11      5.      **Trace America Report and Continued Investigation**

12      On August 2, 2010, Mustard received an e-mail from Battin in regards to a *Trace America*

13  *Report. The Trace America Report* (dated July 30, 2010) includes the following significant notes:

14  **Thursday, July 15, 2010**
    **The Plumbing Dr., 2950 East Charleston, Apt. G, Las Vegas, NV 89104, (702) 324-4967**

15  You indicated that the claimant may work for The Plumbing Dr. We spoke with a male
16  who identified himself as the owner and operator of the plumbing business. He would
    not indicate if The Plumbing Dr. was the name of the business. He explained that he is
17  the sole employee for the company. He went on to say that he has been in business for
    several years. He added that he has worked off and on for other plumbing companies but
18  commented that he is just working for himself at the moment. He told us that his rates
    vary depending on the job. He then identified himself as the claimant and we withdrew
19  ourselves from the conversation.[55]

20      On August 23, 2010, Battin updated Mustard, reporting that a White 2000 Ford Econoline

21  van, bearing the license plate "PLMBDR" was registered to Brashear and insured by State Farm.

22  Battin reported that van bore a sign "The Plumber Dr. 702-324-4967" that he saw Brashear

23  driving this van following the June 21, 2010 recorded interview, during which Brashear noted he

24  / / /

25  / / /

26

27  [54] U.F. No. 54 - See, Decl. Battin, ¶7, Exhibit 4 at BRA00091SIU and ¶8, Exhibit 5.

    [55] U.F. No. 55 - See, Decl. Battin at ¶9, Exhibit 6 at BRA0106SIU and Decl. Mustard, ¶18, Exhibit 16.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                    15

1    had been unable to work as a plumber.  Finally, Battin noted that Trace America found Brashear's

2    "Craig's List" plumber listing and confirmed that he was still working as a plumber.[56]

3        On September 17, 2010, Battin wrote to the law firm indicating that Nationwide was

4    continuing to gather Brashear's medical records.[57]

5        On December 14, 2010, Battin wrote to the law firm and advised that they should have

6    received copies of the medical records obtained by Nationwide and requested a date for the

7    continuation of Brashear's recorded statement.[58]

8        **6.**    **Continued Statement and Request for IME**

9        On February 9, 2011, Battin took another recorded statement of Brashear.  Battin included

10    the following summary in his file notes: [59]

> Mr. Brashear claimed he could no longer engage in any physical activity and continued to be in consistent pain three years after the DOL. . . .
>
> Mr. Brashear confirmed he still owns two vehicles, a Dodge Durango (Buffy's) and a   Ford Econoline Van (Donald's).  When asked to describe his van, he slowly said it was white, a utility van with a roof rack for ladders.  He had to be urged to continue to describe the vehicle and began talking about the tires but when asked directly about his van's Nevada License Plates, he hesitated.  When asked if the van had personalized plates, he only replied yes - not offering any additional information.  When asked if the van's license place were "PLMBDR," he said yes.  When asked what PLMBDR meant? he replied, "PLUMBING DOCTOR."  When asked to continue to describe what else was on his van he reluctantly said it had some writing on the rear door near the license plate.  That writing was "The Plumbing Dr."  When urged to continue to describe what else may be written on the van, Donald again reluctantly said that 720.324-4967 (HIS CELL PHONE NUMBER) was written below "The Plumbing Dr."

On February 23, 2011, Mustard spoke with attorney Peck and requested that Brashear

submit to an IME with Dr. Anthony Serfustini ("Serfustini").  Mustard scheduled the IME for

Monday, April 4, and notified the law firm on February 28.[60]  On March 25, 2011, Peck informed

---

[56] U.F. No. 56 - See, Decl. Battin at ¶10, Exhibit 7 and Decl. Mustard, ¶19, Exhibit 17.

[57] U.F. No. 57 - See, Id. at ¶11, Exhibit 8.

[58] U.F. No. 58 - See, Id. at ¶12, Exhibit 9.

[59] U.F. No. 59 - See, Id. at ¶13, Exhibit 10 at BRA0032SIU to BRA0033SIU..

[60] U.F. No. 60 - See, Decl. Mustard at ¶20, Exhibit 18 and at ¶21, Exhibit 19.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1           16

1    Mustard that Brashear was having back surgery on March 30 and would not be available for the

2    IME on April 4. Mustard arranged to have Brashear's IME performed the next day.[61]  Peck

3    originally indicated Brashear was too busy to make the IME and advised they were not even sure

4    this was a UIM claim. Mustard advised of the concerns on the file, and indicated if Brashear was

5    undergoing a fusion surgery, that would add at least $125,000 in specials. Mustard encouraged

6    Peck to have Brashear appear for the IME. Later that evening, Brashear agreed to appear for an

7    IME on March 29, 2010.[62]

8           7.    **Serfustini's IME and Report**

9           Serfustini prepared a report dated March 29, 2011. Regarding Brashear's reported current

10   symptomology, Serfustini notes that Brashear continued to have significant low back pain (7/10),

11   but no leg pain (which improved after his IDET procedure). Brashear reported that he was not

12   working and could only drive with difficulty. Brashear reported that chiropractic treatment

13   provides only transitory improvement (hours) and pain management is only helpful for 1-2 days).

14   His narcotic usage continues at 6 Lortab per day, as well as Morphine 2x a day, Valium 2x a day

15   and Soma 4 to 5 per week. Any type of sitting, bending, and lifting increased his discomfort. His

16   pain was greatest in the morning and at night, often awakens him at night and was increased by

17   coughing and sneezing. Brashear reported he could not recall when he last worked but states that

18   he got laid off.  Brashear reported "a back injury in the past, but did not elaborate."[63]

19          Serfustini further noted that Brashear could get on and off the examining table without any

20   particular difficulty. There was no evidence of any muscle atrophy or fasciculation for either the

21   upper or the lower extremities. The range of motion for the cervical spine was functional. Range

22   of motion of the lumbosacral spine shows 50 degrees of flexion, 20 degrees of extension,

23   sidebending 20 degrees both right and left. Gait was tandem with heel-to-toe walking done quite

24   / / /

25   _____

26   [61] U.F. No. 61 - See, Decl. Mustard at ¶22, Exhibit 20; ¶23, Exhibit 21 and ¶24, Exhibit 22.

27   [62] U.F. No. 62 - See, Id. at and ¶23, Exhibit 21 and ¶25, Exhibit 23.

     [63] U.F. No. 63 - See, Id. at ¶26, Exhibit 24 at BRA1281 CF.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                            17

1  well. There was no evidence of any posterior element guarding. There was no evidence of any

2  muscle spasm for the lumbosacral spine or cervicothoracic spine.[64] Serfustini concluded:

> . . . There are no indications from the early clinical course that his cervical spine was related to the motor vehicle incident of 01/09/08. With the potential for sprain/strain to the involved areas, a judicious amount of soft tissue treatment would have been appropriate and indeed this was accomplished at Kelly Hawkins PT. This lumbosacral pain syndrome continued with continued chronic narcotic usage similar to the pre-incident usage (reference primary care visits prior to the incident of 01/09/08). There is a significant nine-month hiatus between the pain management physician and then the chiropractic evaluation in 2008. Based upon employment records, it would appear this individual was quite proficient and diligent in carrying out various plumbing activities, such as installing water heaters of various capacities, reverse osmosis systems, along with garbage disposals, toilets, and soft water systems. These employment records indicate no less than 180 invoices with the attendant plumbing activities (this individual continued to work full time as a plumber until 12/08/10).

> The clinical course readily documents that this individual was 90% better at the physical therapy visit of 03/21/08. At his final visit with pain medicine/physical medicine with Edward Outlaw, MD on 03/27/08, there were no contraindications for him working full duty. Finally, any treatment past 03/27/08 would have no causal link as it relates to the motor vehicle incident of 01/09/08. The scientific basis for this principal rests on the fact that this individual had well established chronic low back pain syndrome requiring significant amounts of narcotic medication. [65]

### 8.    Time Limit / Policy Limit Demand

On November 7, 2011, Mustard noted a time limit policy limits demand for the UIM limits

of $1 million (dated October 25, 2011). The law firm advised that Brashear had settled with the

tortfeasor for the $100,000 limits and requested a response to the demand by November 9, 2011.[66]

That same day, Mustard and his supervisor conferenced the file. Although they agreed that

treatment after 60 days did not appear causally related to the accident, they agreed to schedule a

claims conference.[67]

On November 7, 2011, Mustard acknowledged receipt of the demand. Mustard requested

records and bills from the beginning of 2010, including the recent fusion, as well as records in

---

[64] U.F. No. 64 - See, Decl. Mustard at ¶26, Exhibit 24 at BRA1282 CF.

[65] U.F. No. 65 - See, Id. at ¶26, Exhibit 24 at BRA1283 CF to BRA1284 CF..

[66] U.F. No. 66 - See, Id. at ¶27, Exhibit 25 and ¶28, Exhibit 26 at BRA0067-CF-PSPT.

[67] U.F. No. 67 - See, Id. at ¶28, Exhibit 26 at BRA0067-CF-PSPT.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1

18

1   support of lost earnings.  Mustard also requested an extension of the demand.  Although Peck

2   would not grant an extension he indicated Mustard could send correspondence indicating that

3   Nationwide could not evaluate the claim until receipt of all records, which Mustard did.[68]

4       On December 29, Mustard noted receipt of a letter from Peck, but noted that the CD with

5   records had been sent to the Des Moines office.  The letter enclosed Brashear's W-2's from 2005,

6   2006, 2007 and 2008 and indicated that Brashear had been unable to work for the past 3 years as a

7   result of the accident.  Finally, Peck indicated that Brashear had medical specials of $282,781.81

8   (and climbing), that he was still treating with Nevada Spine Clinic, and again demanded the policy

9   limits.[69]

10      On January 4, 2012, Mustard picked up a copy of the CD from the law firm.  Mustard

11  contacted Serfustini regarding review of the additional medical records.  Mustard advised the law

12  firm that he was sending the records for review and, after receipt of the report, Nationwide would

13  review the report and finalize its evaluation.[70]

14          **9.   Supplemental Record Review**

15      On February 16, 2012, Mustard wrote Serfustini advising that after the March 26, 2011

16  IME, Brashear proceeded with an anterior/posterior lumbar interbody fusion at L5-S1.  Mustard

17  provided the updated medical records and requested Serfustini "conduct a desk review of updated

18  records" and provide a "written report regarding the reasonableness and appropriateness of the

19  treatment for Mr. Brashear's neck and low back pain."  Additional records were provided to

20  Serfustini for review.[71]

21  / / /

22  / / /

23  / / /

24  _____

25  [68] U.F. No. 68 - See, Decl. Mustard at ¶28, Exhibit 26 at BRA0068-CF-PSPT to BRA0069-CF-PSPT and ¶29, Exhibit 27.

26  [69] U.F. No. 69 - See, Id. at ¶30, Exhibit 28 and ¶31, Exhibit 29.

27  [70] U.F. No. 70 - See, Id. at ¶32, Exhibit 30 and ¶33, Exhibit 31.

    [71] U.F. No. 71 - See, Id. at ¶34, Exhibit 32.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                        19

1    **10.    Serfustini's Supplemental Record Review**

2         On March 6, 2012 Serfustini supplemented his report.  Serfustini concluded his

3    supplemental report as follows:[72]

4         Based upon these additional medical records, it would appear that his
         chronic pain syndrome was ongoing with multiple visits to Dr. Rosler and
5         Dr. Grover.  The clinical course in 2009 shows a 5 1/2 month hiatus
         between health care visits (reference follow up visit Jorg Rosler, MD
6         12/15/2009.)  It would appear this individual over the course of time has had
         intermittent flare ups that at times have been intolerable.  Indeed the most
7         recent flare up necessitating lumbar discography and subsequent global
         fusion and reconstruction at L5-S1 (reference discography 01/04/2011 and
8         surgical intervention of 03/30/2011.)  Once again, one can reiterate with
         respect to the soft tissue injuries incurred secondary to the motor vehicle
9         incident of 01/09/2008 that there was documented resolution as noted by the
         pain management clinical course with Dr. Edward Outlaw through
10        03/27/2008.  Although done within the standard of care, the pain
         management and orthopaedic care following this date would have no causal
11        link to the incident of 01/09/2008.  The scientific basis for this opinion rests
         in the clinical course as well as the documented, well-established chronic
12        pain syndrome with pain scores of 10/10 with this low back pain syndrome
         occurring well into one year prior to the incident of 01/09/2008. The
13        medications that he was receiving for his spinal pain and neuropathy were
         inclusive of:

14
         1. Lortab 10mg, one to two every 4 to 6 hours, dispensing 180.
15        2. Flexeril 10mg, twice a day.
         3. Neurontin three times per day, dispensing 90.
16
         Because of this chronic pain syndrome, just 7 days prior to the incident of
17        01/09/2008, his medications were refilled for all three meds.

18   **11.    Further Evaluation of Claim**

19        On March 8, 2012, Mustard advised attorney Peck that the supplemental report had been

20   received, but the earliest the claim could be set for management conference was March 27, 2012,

21   and that the law firm could expect a response by March 30.  Mustard confirmed the conversation

22   in writing and advised that Nationwide appreciated the cooperation.[73]

23   / / /

24   / / /

25   / / /

26   _____

27   [72] U.F. No. 72 - See, Id. at ¶35, Exhibit 33 at BRA2402 CF to BRA2403 CF.

     [73] U.F. No. 73 - See, Decl. Mustard at ¶36, Exhibit 34 and ¶37, Exhibit 35.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                    20

1    On March 29, 2012, another file conference was held on the claim.  Based on the full

2  investigation and documented facts, Nationwide determined that Brashear was adequately

3  compensated by the tortfeasor, and Nationwide would not extend an offer.[74]

4    **12.    Denial of Demand**

5    On March 29, 2012 Mustard wrote attorney Peck that "it is Nationwide's position that your

6  client has been adequately compensated by the at fault party's $100,000 liability policy."[75]

7    On April 6, 2012, the law firm sent a written request for a detailed explanation of the

8  denial.[76]

9    On April 16, Mustard sent the letter to the firm explaining:[77]

10    Nationwide's evaluation was based on our investigation and review of your
    client's medical records.  We have also based our position on Dr. Anthony
11    Serfustini's Independent Medical Examination on March 29, 2011 and his
    review of your client's records following his back surgery.  Dr. Serfustini
12    has opined that Mr. Brashear's back surgery was not related to injuries
    sustained from the auto accident on January 9, 2008.  Furthermore, your
13    client's medical records indicate that he was 90% improved by March 21,
    2008.

14
    It is Nationwide's position that your client sustained a soft tissue injury and
15    he has been adequately compensated by the tortfeasor's $100,000.00 policy
    limits.

16
    On April 18, 2012, the law firm responded noting that Travelers, based on the same
17
  information, had evaluated the claim as worth at least $100,000, and requested to review the
18
  information which was the basis of the denial, including medical records which indicated that
19
  Brashear was 90% improved by March 21, 2008.[78]  In response, on April 27 Mustard provided
20
  Serfustini's reports to the law firm.[79]
21
  / / /
22

23  _____

24  [74] U.F. No. 74 - See, Id. at ¶38, Exhibit 36.

    [75] U.F. No. 75 - See, Decl. Mustard at ¶39, Exhibit 37.
25  [76] U.F. No. 76 - See, Id. at ¶40, Exhibit 38.

26  [77] U.F. No. 77 - See, Id. at ¶41, Exhibit 39.

    [78] U.F. No. 78 - See, Id. at ¶42, Exhibit 40.
27  [79] U.F. No. 79 - See, Id. at ¶43, Exhibit 41.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                        21

1    On May 30, 2012, the law firm sent a letter acknowledging receipt of Serfustini's reports.[80]

2    On June 11, 2012, Mustard sent another letter to Mortensen stating the evaluation was

3    based on the company's investigation, Brashear's medical records and Serfustini's reports.[81]

4    On July 16, 2012, Mustard reviewed the file and noted that there was no response from the

5    law firm.[82]

6    **13.    Lawsuit File and Plaintiff's Deposition**

7    On August 13, 2012, Brashear filed a complaint against Nationwide in the Clark County

8    District Court.  The complaint was timely removed to the federal district court.  The complaint

9    states claims against Nationwide for breach of contract, breach of the implied covenant of good

10   faith and fair dealing and violations of NRS 686A.310 and seeks punitive damages.

11   Brashear was deposed on February 25, 2013 in this action.  When asked whether he had

12   any complaints or criticisms he had regarding how Nationwide had handled his claim, he

13   responded "No".[83]

14   **III.**

15   **LEGAL ARGUMENT**

16   **Summary Judgment Should Be Granted When There Is No Genuine Issue of**

17   **Material Fact and the Moving Party is Entitled to Judgment as a Matter of Law**

18   Rule 56 of the Federal Rules of Civil Procedure authorizes the court to enter summary

19   judgment in a party's favor when that party demonstrates "there is no genuine issue as to any

20   material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ.*

21   *P. 56(c)*.  The purpose of summary judgment is to isolate, and then terminate, claims and defenses

22   that are factually unsupported. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct.

23   2548, 2552-53, 91 L. Ed. 2d 265 (1986).

24

25   [80] U.F. No. 80 - See, Id. at ¶44, Exhibit 42.

26   [81] U.F. No. 81 - See, Id. at ¶45, Exhibit 43.

     [82] U.F. No. 82 - See, Id. at ¶46, Exhibit 44.

27   [83] U.F. No. 83 - See, Decl. Meredith at ¶5, Exhibit 3 at p. 122:9-17.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                        22

1    Nationwide is entitled to judgment "as a matter of law" when the plaintiff fails to make an

2    adequate showing on an essential element of his case, as to which he has the burden of proof. *See*,

3    *Cleveland v. Policy Management Sys. Corp*, 526 U.S. 795, 804, 119 S. Ct. 1597, 1603, 143 L. Ed.

4    2d 966 (1999); *Celotex, supra*, 477 U.S. at 323, 106 S. Ct. at 2552, 91 L. Ed. 265. "Thus, '[w]here

5    the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is

6    no genuine issue for trial' and summary judgment is proper." *Id.*, quoting *Matsushita Elec. Indus.*

7    *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

8    **A.    As a Matter of Law, an Insurer Does Not Act in Bad Faith When a Fairly Debatable**

9    **Issue of Fact or Law Provides a Reasonable Basis For An Insurer's Actions**

10    **1.    The Standard For Bad Faith**

11    In every insurance contract there is an implied covenant of good faith and fair dealing on

12    the part of both parties. *Pemberton v. Farmers Ins. Exch.*, 109 Nev, 789, 792-93, 858 P.2d 380,

13    382 (1993). A breach of the covenant of good faith and fair dealing constitutes  the tort of "bad

14    faith" when the relationship between the parties is that of insurer and insured. *Pemberton*, 109

15    Nev. at 793, 858 P.2d at 352; *U.S. Fidelity & Guar. Co. v. Peterson*, 91 Nev. 617, 620, 540 P.2d

16    1070, 1071 (1975).

17    An insured may not institute a bad faith action against an insurer with regard to UIM

18    benefits until the insured establishes "legal entitlement" to policy proceeds and unreasonable

19    conduct  by the insurer concerning its obligation to the insured. *Pemberton*, 109 Nev. at 797, 858

20    P.2d at 384. An insured must establish the following elements to  be legally entitled to UIM

21    policy proceeds:  (1) fault on the part of the uninsured/underinsured motorist; and (2) the *extent of*

22    *damages caused* by the uninsured/underinsured motorist. *Pemberton*, 109 Nev. at 796, 858 P.2d

23    at 384.

24    The Nevada Supreme Court has defined bad faith as "an actual or implied awareness of

25    the absence of a reasonable basis for denying benefits of the insurance policy." *Allstate Ins. Co.*

26    *v. Miller*, 212 P.3d 318, 324 (2009)(citing *Am Excess Ins. Co. v. MGM*, 102 Nev. 601, 605, 729

27    P.2d 1352, 1354-55 (1986)). Thus, under Nevada law, an insurer breaches the duty of good faith

28    and fair dealing by:  (1) acting unreasonably; <u>and</u> (2) <u>with knowledge</u> that there was no

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                                            23

1 reasonable basis for its conduct. *Guaranty Natl. Ins. Co. v. Potter*, 112 Nev. 199, 912 P.2d 267

2 (1996).

3       Bad faith is not evaluated under a reasonable conduct standard. *Pioneer Chlor Alkali Co.*,

4 863 F. Supp. at 1243 ("bad faith involves something more than an unreasonable action, a

5 negligent action, by the insurer"). Instead, bad faith requires awareness by the insurer that no

6 reasonable basis exists for its claims decision ("a mens rea of knowing or reckless intent"). *Id.*

7 Thus, if the insurer's actions resulted from "an honest mistake, bad judgment or negligence", then

8 the insurer is not liable under a bad-faith theory. *Allstate Ins. Co. v. Miller, supra*, 212 P.3d at

9 330. A bad-faith claim requires a showing that the insurer acted in deliberate refusal to discharge

10 its contractual duties. *Id.* (citing to *HOA v. Associated Internat. Ins. Co.*, 90 Cal. App. 4th 335

11 (2001).)

12     **2.**     **An Insurer Is Not Liable For Bad Faith If the Claim Being Made Is "Fairly**

13         **Debatable"**

14       The Nevada Supreme Court recently held that, "When there is a genuine dispute regarding

15 an insurer's legal obligations, the district court can determine if the insurer's actions were

16 reasonable." *Allstate Ins. Co. v. Miller, supra*, 212 P.3d at 330. Furthermore, an insurer is not

17 liable for bad faith merely for being incorrect about a claim determination as long as the insurer

18 had a *reasonable basis* to take the position that it did. *Pioneer Chlor Alkali Co.*, 863 F. Supp. at

19 1242. Where an objectively reasonable basis for a claims decision actually exists, an insurer

20 cannot be held liable for bad faith as a matter of law. *Morgan v. Am. Fam. Mut. Ins. Co.*, 534

21 N.W.2d 92, 96 (Iowa 1995), overruled on other grounds. *Hamm v. Allied Mut. Ins. Co.*, 612

22 N.W.2d 775 (Iowa 2000).

23       Numerous courts have held that a reasonable dispute between an insured and an insurer

24 over the amount, if any, of policy benefits to be paid cannot, as a matter of law, support a claim for

25 bad faith. *See, e.g. Chester v. State Farm Ins. Co.*, 789 P.2d 534, 537 (Idaho 1990)("Mere failure

26 to settle a debatable claim does not constitute bad faith."); *Town & Country Mut. Ins. Co. v.*

27 *Hunter*, 472 N.E.2d 1265 (Ind. App. 1985); *United Nuclear Corp. v. Allendale Mutual Ins. Co.*,

28 709 P.2d 649, 654 (N.M. 1985)("[S]ince there were legitimate questions regarding the amount of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1       24

1  claimed damages . . . we cannot say that [the Insurer's] failure to pay [the Insured's] claim was

2  malicious or in bad faith."); *LeFevre v. Lamar*, 590 So. 2nd 154 (Ala. 1991); *Stevenson v. Union*

3  *Standard Ins. Co.*, 746 S.W. 2nd 39 (Ark. 1988); 293 A. 2nd 481 (D.C. App. 1972)("In the instant

4  case failure to pay for the loss within 30 days after submission of proof of loss raised no issue of

5  bad faith where there were honest disputes over coverage and amount of damages"); *Bard's*

6  *Apparel Manu, Inc. v. Bituminos Fire and Marine Ins. Co.*, 849 F.2d 245, 249 (6th Cir.

7  1988)("Delay in settling a claim does not constitute bad faith when there is a genuine dispute as to

8  value, no conscious indifference to the claim, and no proof that the insurer acted from 'any

9  improper motive'.").

10      A bad faith claim can be dismissed on the basis of summary judgment if the insurer can

11  show that there is a genuine dispute as to the value of the claim. *See, Guebara v. American*

12  *Family Insurance Company*, 237 F.3d 987, 992 (9th Cir. 2001).

13  **B.**    **Summary Judgment Should Be Granted in Favor of Nationwide On the Claim For**

14          **Bad Faith Because This Case is Nothing More Than a Dispute Over the Nature,**

15          **Extent and Cause of Brashear's Injuries**

16      The instant case does not present a case for a finding of "bad faith". In this case, the only

17  issue in dispute is the nature and extent of Brashear's injuries and whether these injuries were

18  caused by the accident at issue. Brashear cannot establish that Nationwide acted without a

19  reasonable basis when it valued his claim as being fully compensated by the tortfeasor's policy

20  limits of $100,000.

21      It is undisputed that Brashear suffered previous injuries to his back from a prior auto

22  accident and two work-related accidents. It is undisputed that Brashear had been seeking medical

23  treatment for chronic and severe low back pain for at least three (3) years prior to the January 2008

24  accident. It is undisputed that Brashear was consuming substantial amounts of prescription

25  medications for his low back pain for several years prior to the January 2008 accident. It is

26  undisputed that Brashear drove himself from the scene of the accident, did not treat with a doctor

27  until 5 days after the accident, and went to work the day after the accident and performed his

28  regular duties. It is also undisputed that, when Brashear did seek medical treatment, he underwent

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                    25

1  a fairly standard course of chiropractic care and declared himself 90% improved by the end of

2  March 2008. He then went 6 months before he again sought treatment for low back pain.

3       Based on these facts, it is logical and reasonable that Nationwide's value of the claim was

4  that Brashear had been fully compensated by the $100,000 received. In other words, given the

5  facts of the accident, Brashear's work and medical history, the medical treatment received, the

6  good results obtained, and the opinion of the IME doctor retained to evaluate Brashear, it was

7  reasonable to conclude the injuries claimed were not related to the accident, and Brashear had

8  been fully compensated by the $100,000 received. As review of the claims file makes clear,

9  Nationwide did a thorough and complete investigation of the claim. Mustard reviewed and

10 evaluated the medical records presented, considered the treatment rendered, the notes and

11 evaluations of doctors regarding Brashear's injury, his work history, the length of treatment

12 initially received, the good outcome achieved and the IME report. Then, based on his experience

13 and consultation with his supervisors, he placed a value on Brashear's claim. Nationwide was

14 willing to reconsider information at all stages. Plaintiff can disagree with Nationwide over the

15 issue of causation and value of his injury, but the evidence illustrates an objective, thoughtful and

16 reasoned approach in investigation and valuing the claim and communicating with Plaintiff's

17 counsel.

18      Brashear has not presented, and cannot present, any evidence that suggests that

19 Nationwide's claims evaluations were <u>knowingly</u> <u>unreasonable</u> especially given the fact that

20 Plaintiff does not have a claims handling expert.[84] Nationwide did retain a claims handling expert

21 who has opined that Nationwide's handling of the claim was reasonable and consistent with the

22 standard of care for similarly situated insurers.[85] Given that Nationwide had a reasonable basis for

23 refusing to pay anything in access of the $100,000 received, Nationwide could not have acted with

24 knowledge or awareness that no reasonable basis existed for its decision. The undisputed facts fail

25 / / /

26

27 [84] <u>See</u>, Decl. of Meredith, ¶ 20.

   [85] <u>See</u>, Decl. of Meredith, ¶ 21, Exhibit 10.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1

26

1  to establish the require elements of Brashear's bad faith claim and Nationwide is entitled to

2  summary judgment on Brashear's bad faith claim as a matter of law.

3  **C.      The Unfair Insurance Practices Act Claim**

4        The Nevada Legislature has adopted the Unfair Insurance Practices Act ("UIPA"), NRS

5  686A.010, *et* seq.  The Act provides insureds a private right of action under the statute.  See

6  N.R.S. 686A.310(2)("In addition to any rights or remedies available to the Commissioner, an

7  insurer is liable to its insured for any damages sustained by the insured as a result of the

8  commission of any act set forth in subsection 1 as an unfair practice.").

9        The UIPA sets forth a series of specific prohibited acts under which an insurer may

10  become liable to the insured for damages sustained.  Plaintiff's complaint is claiming a violation

11  of the following sections of NRS 686A.310:

12             (e)    Failing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonable clear.

13

                               * * * * *

14

15             (n)    Failing to provide promptly to an insured a reasonably explanation of the basis in the insurance policy, with respect to the facts of the insured's claim and the applicable law, for the denial of the claim or for

16                  an offer to settle or compromise the claim.

17        However, as set forth in detail above, Nationwide has a reasonable and logical basis for its

18  handling of the claim and how it valued the claim and clearly and timely communicated with

19  Brashear's counsel at all times.  As a result, any claimed violation of the Nevada Unfair Claims

20  Settlement Practices Act fail, and Nationwide is entitled to judgment on this claim.

21  **D.      Brashear Has No Clear and Convincing Evidence to Justify an Award of Punitive**

22        **Damages**

23        Should the Court grant Nationwide's Motion for Summary Adjudication on the "bad faith"

24  and breach of the UPIA claims, then the claim for punitive damages fails as a matter of law.

25  However, if the Court does not grant summary judgment on these two claims, Nationwide submits

26  that judgment should enter in its favor on the claim for punitive damages as set forth below.

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1              27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Punitive damages are governed by NRS 42.005, which provides in relevant part:

> 1.     Except as otherwise provided in NRS 42.007, an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant. . . . However, these statutory definitions are not applicable "for the purpose of an action brought against an insurer who acts in bad faith regarding its obligations to provide insurance coverage". *See* NRS 42.005(5). Instead, the "the corresponding provisions of the common law apply."

The issue of whether a plaintiff has presented sufficient evidence to justify a punitive damage instruction at trial is a question of law for the Court. *See, Smith Food & Drug Centers, Inc. v. Bleared*, 114 Nev. 602, 958 P.2d 1208 (1998).

Proof of bad faith, in and of itself, does not establish liability for punitive damages. *See, United Fire Insurance Company v. McClelland*, 105 Nev. 503, 780 P.2d 193 (1989); *United States Fidelity Guaranty v. Peterson*, 91 Nev. 617, 540 P.2d 1070 (1975). In order to be entitled to a jury instruction on the issue of punitive damages, the plaintiff must come forward with sufficient evidence to support the requisites for malice, oppression or fraud to justify an instruction on punitive damages.

In addition, Nevada law requires clear and convincing evidence of malice, oppression or fraud before punitive damages may be recovered. "A plaintiff is never entitled to punitive damages as a matter of right." *Dillard Department Stores v. Beckwith*, 115 Nev. 372, 380, 989 P.2d 882, 887 (1999)(quoting *Ramada Inns v. Sharp*, 101 Nev. 824, 826, 711 P.2d 1, 2 (1985)). Rather, where the district court has determined that the conduct at issue is, as a threshold matter, subject to civil punishment, the allowance or denial of exemplary or punitive damages rests entirely in the discretion of the trier of fact. *See, Smith's Food & Drug Centers*, 114 Nev. 602, 606, 958 P.2d 1208, 1211 (1998); *Ramada Inns v. Sharp*, 101 Nev. 824, 826, 711, P.2d 1, 2 (1985).

Under common law "oppression" is defined as "a conscious disregard for the rights of others which constitutes an act of subjecting plaintiffs to cruel and unjust hardship". *United Fire*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                          28

1   *Ins. Co.,* 105 Nev. 504, 512-13, 780 P.2d 193, 198 (1989)(quoting *Ainsworth v. Combined Ins.*

2   *Co.,* 104 Nev. 587, 590, 763 P.2d 673, 675 (1988), cert denied, 493 U.S. 958, 107 L. Ed. 2d 361,

3   110 S. Ct. 376 (1989).

4        Fraud must be proven by clear and convincing evidence as to each of the following

5   elements: (1) a false representation made by the defendant, (2) defendant's knowledge or belief

6   that the representation is false (or insufficient basis for making the representation), (3) defendant's

7   intention to induce the plaintiff to act or to refrain from acting in reliance upon the

8   misrepresentation, (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) damage to

9   the plaintiff resulting from such reliance. *Albert H. Wohlers & Co. v. Barges*, 114 Nev. 1249,

10   1260-61, 969 P.2d 949, 957-58 (1998). "One may not recover punitive damages for

11   misrepresentations made in the performance of a contract. . . . The plaintiff must prove that his

12   injuries actually resulted from the fraud and not from the breach of the . . . contract. The injuries

13   must be entirely separate from those suffered because of breach. Otherwise, there is too great a

14   danger that [plaintiff] is using injuries resulting from the breach [of contract] as a basis for tacking

15   on punitive damages. *Clark v. Labrets*, 113 Nev. 1089, 1096, 944 P.2d 861, 865 (1997); citing

16   *Nissho-Iwai Co., Ltd. V. Occidental Crude Sales*, 729 F.2d 1530 (5th Cir. 1984).

17        The malice contemplated NRS 42.005 is malice in fact and the phrase "express or implied"

18   has reference only to the evidence by which malice is established; malice in fact must be

19   established by the evidence if it is the ground relied upon to support an award of punitive

20   damages. Malice in fact sufficient to support an award of damages may be established by a

21   showing that the wrongful conduct was willful, intentional and done in reckless disregard of its

22   possible results. *Jeep Corp. v. Murray*, 101 Nev. 640, 708 P.2d 297 (1985). Under common law,

23   "malice involves actual hatred or ill-will, or the desire to successfully injure, vex, annoy, or

24   harass". *See, Pioneer, supra*, 863 F. Supp. at 1251. It is the responsibility of the trial court to

25   determine whether, as a matter of law, the plaintiff has offered substantial evidence of malice in

26   fact to support a punitive damages instruction. *Wickliffe v. Fletcher Jones of Las Vegas, Inc.,* 99

27   Nev. 353, 661 P.2d 1295 (1983).

28   / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1                                         29

1      Again, it is apparent from the undisputed facts of this case that there is no clear and

2  convincing evidence of malice, oppression or fraud by Nationwide in the handling of this claim.

3  The claim for punitive damages fails as a matter of law.

4  **IV.**

5  **CONCLUSION**

6      For the above-stated reasons, Nationwide's motion is well taken and summary judgment

7  should be entered in its favor on Plaintiff's claims for "bad faith" and violations of the UIPA.

8      Dated this _23_ day of May, 2013.

9                          LEWIS BRISBOIS BISGAARD & SMITH LLP

11

12                   By: _Krist E. Meredith_

                        KRISTIN E. MEREDITH, Esq.

13                  Nevada Bar No. 011655

                    PRISCILLA L. O'BRIANT, Esq.

14                  Nevada Bar No. 010171

                    6385 S. Rainbow Boulevard, Suite 600

                    Las Vegas, Nevada 89118

15                  *Attorneys for Defendant Nationwide Mutual*

                    *Insurance Company (Nationwide)*

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4822-6922-8307.1

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of Lewis, Brisbois, Bisgaard & Smith, LLP and that on this $\underline{25}$ day of March, 2013, a true and correct copy of the foregoing **DEFENDANT NATIONWIDE MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY ADJUDICATION OF ISSUES** in Brashear v. Nationwide Mutual Ins. Co., United State District Court Case No. 2:12-cv-01691-LRH-CWH was placed in an envelope, postage prepaid, and deposited in a US Mail box addressed to the parties on the Electronic Mail Notice List as follows:

> Peter Mortenson
> MORTENSON & RAFIE, LLP
> 10781 W. Twain Avenue
> Las Vegas, NV 89135

By _____
Pamela January an Employee of
LEWIS BRISBOIS BISGAARD & SMITH LLP

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW